UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIAM MURPHY,

        Plaintiff,                             Case No. 1:21-cv-12089

v.                                            Honorable Thomas L. Ludington
                                                  United States District Judge

JOSHUA MAY, *et al.*,

        Defendants.
_____/

**OPINION AND ORDER GRANTING AND DENYING IN PART DEFENDANT MAY'S MOTION TO DISMISS**

Defendant Joshua May has filed a motion to dismiss Plaintiff William Murphy's complaint. ECF No. 9. For the reasons stated hereafter, Defendant's Motion will be granted and denied in part; Plaintiff's knock-and-announce claim will be dismissed, but his excessive-force and battery claims will proceed.

**I.**

This case arises from an injury to an innocent bystander during a no-knock drug raid. The following facts are taken from Plaintiff's Amended Complaint and assumed true for purposes of this Opinion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, *accepted as true*, to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added)).

**A.**

Plaintiff William Murphy is a 60-year-old minister and resident of Saginaw, Michigan. He earns extra money operating the carpet-cleaning business Xtreme Carpet & Upholstery Cleaning Service. ECF No. 8 at PageID.28–29. On the morning of Friday, August 28, 2020, Plaintiff and

- 2 -

his employee, Steve Boles, arrived at a small house in Saginaw for a carpet-cleaning job. *Id.* at 31. Unbeknownst to Plaintiff, the house was the target of an impending drug raid by the Bay Area Narcotics Enforcement Team ("BAYANET"), a multijurisdictional taskforce overseen by the Michigan State Police. *Id.* Two days earlier, a confidential informant purchased crack cocaine from the house's owner, Scinicor McMullen. *Id.* at PageID.31–32. Police used that information to obtain a search warrant for the house. *Id.* Given the concern that McMullen would be armed and dangerous, the warrant authorized the police to enter the house without announcing their presence (a "no-knock warrant"). *Id.* at PageID.32.

The search team was in position when Plaintiff and Boles arrived at McMullen's house, driving a van decaled with the name of Plaintiff's carpet-cleaning business. *Id.* at PageID.32–33. Plaintiff and Boles entered the house around 11:00 AM carrying hoses and other cleaning equipment. *Id.* at PageID.33. Both were wearing uniforms identifying them as carpet cleaners. *Id.* at PageID.31.

At around 11:10 AM, McMullen left the house and drove away. *Id.* at PageID.33. The police stopped him a few blocks away and discovered large amounts of cash and crack cocaine on his person. *Id.* During the stop, the police informed McMullen that they had a search warrant for his house and asked him who was still there. *Id.* He responded that "his wife, his three children[,] and two carpet cleaning guys were there." *Id.* (quoting the police report). One of the officers at the stop relayed this information to the search team waiting outside McMullen's house. *Id.*

At around 11:17 AM, the search team decided to proceed with the raid and entered the house through a small addition on the back porch, which had been modified into a living space. *Id.* at PageID.34. Shortly after entering the house, the search team located and removed McMullen's wife and children. *Id.* Defendant Joshua May, a detective trooper with the Michigan

State Police, stationed himself at the doorway between the back porch and the main domicile to provide security. *Id.* at PageID.34–35. Immediately adjacent to him, in the main house, was the kitchen. *Id.*

After McMullen's family was removed, a "black male wearing only shorts presented himself in the kitchen with his hands up," saying, "[W]e in here."[1] *Id.* at PageID.35 (quoting from the police report). Defendant[2] asked how many people were still in the house; the man responded, "[T]hree."[3] *Id.* Defendant ordered the man to walk toward him and told the officers on the porch that he was "sending one out." *Id.* The man walked through the kitchen, past Defendant, and onto the back porch without incident. *Id.*

After the man walked past Defendant, Plaintiff walked into the kitchen, also with his hands up. *Id.* Plaintiff promptly informed Defendant that he was simply there to clean carpet. *Id.* Defendant, with his weapon drawn, ordered Plaintiff to walk toward him and onto the porch. *Id.* Plaintiff obeyed his command and walked through the kitchen. *Id.* As he walked by Defendant, Plaintiff remarked, "You don't have to holler." *Id.* Apparently angered by the remark, Defendant shoved Plaintiff from behind, causing him to fall down the stairs leading out of the kitchen. *Id.* "[Defendant] then 'followed him to the ground' and came to rest on top of him at the bottom of the stairs." *Id.* (quoting police report). Despite Plaintiff's complaints of pain in his shoulder, Defendant forced Plaintiff's hands behind his back and cuffed him. *Id.*

Shortly after being handcuffed, Plaintiff was taken by ambulance to the local hospital, where an MRI revealed a "soft tissue ligamentous injury" in his spine. *Id.* at PageID.36.

---

[1] The parties have not identified this man, so it is unclear whether he was Plaintiff's employee, Steve Boles, or some other person.
[2] Because Officer May is the only Defendant at issue in this Opinion, he will be referred to simply as "Defendant."
[3] It remains unclear who the "three" people were, in part because it remains unclear who the "male wearing only shorts" was and what he knew when he spoke with Officer May.

B.

In September 2021, Plaintiff filed a complaint naming Officer May, the Michigan Department of State Police, and "other unnamed officers" as Defendants.[4] ECF No. 1. He later voluntarily dismissed his claims against the Michigan Department of State Police, ECF No. 7, and filed an amended complaint consisting of his remaining allegations, ECF No. 9.

Plaintiff's Amended Complaint includes two counts: Count I alleges that Defendants violated Plaintiff's rights under the Fourth and Fourteenth Amendments by using excessive force against him and by entering McMullen's house without knocking. ECF No. 8 at PageID.37–40. Count II alleges that Officer May battered Plaintiff in violation of Michigan law. *Id.* at PageID.40–41.

In November 2021, Officer May filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff has not plausibly alleged a violation of his constitutional and common-law rights. ECF No. 9. Officer May also argues that he is entitled to qualified immunity. *Id.* at PageID.68–73. His motion has since been fully briefed.

II.

Under Rule 12(b)(6), a complaint fails to state a claim if it does not contain allegations that support recovery under any recognizable theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, a district court must construe the complaint in the nonmovant's favor and accepts the complaint's factual allegations as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment]

---

[4] Plaintiff states that he has been unable to identify the other officers involved in the raid because the records the Michigan State Police produced were "heavily redacted." ECF No. 8 at PageID.30. He intends to seek leave to file another amended complaint after learning their identities. *Id.*

to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

### III.

### A.

Plaintiff brings Count I under 42 U.S.C. § 1983. "To prevail on a cause of action under § 1983, a plaintiff must prove (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) (internal quotation marks omitted).

The second prong requires little analysis. Plaintiff alleges that, at all relevant times, Defendant was participating in a drug raid on behalf of BAYANET and the Michigan State Police. In doing so, he was acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 50 (1988) ("Generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.").

The first prong, however, requires more attention. As indicated, Plaintiff presents two theories of liability: (1) that Defendant used excessive force against him, and (2) that Defendant wrongfully entered McMullen's house without knocking. For Count I to survive, at least one of these theories must be cognizable. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to state *a* claim for relief that is plausible on its face." (emphasis added)). Each theory is addressed in turn below.

i.

The Fourth Amendment guarantees the right of persons to be free from "unreasonable searches and seizures." U.S. CONST. amend. IV. "The use of excessive force in the execution of a search warrant constitutes a Fourth Amendment violation." *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). "To determine whether a constitutional violation based on excessive force has occurred, [the Sixth Circuit] applies 'the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight.'" *Id.* (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)). "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Broadly speaking, Plaintiff alleges two instances of excessive force: (1) Defendant's brandishing of a firearm while Plaintiff walked through the kitchen, and (2) Defendant's shoving and handcuffing of Plaintiff after he remarked, "You don't have to holler." ECF No. 8 at PageID.38–40. In Plaintiff's view, both instances reflect excessive force because Defendant knew that McMullen was in custody and had no reason to suspect that Plaintiff was dangerous. *Id.*

The Sixth Circuit's decision in *Binay* is instructive. In *Binay*, apartment residents sued officers from the Downriver Area Narcotics Division ("DRANO") for excessive force after they held the residents at gunpoint for an hour while raiding their apartment. *Binay*, 601 F.3d at 643–45. In affirming the district court's denial of the officers' motion for summary judgment, the Sixth Circuit found a question of fact as to whether the officers used excessive force in detaining the residents. *Id.* at 649–50. Among other factors, the Sixth Circuit emphasized that "[the residents]

had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee." *Id.* The Sixth Circuit also rejected the officers' reliance on prior cases holding that the use of handcuffs and firearms to detain a suspect was reasonable, explaining, "[T]he fact that it is sometimes reasonable to use handcuffs and guns when detaining suspects does not support [the officers'] argument that the amount of force used *in this case* was objectively reasonable." *Id.* "Whether an exercise of force is excessive," the Sixth Circuit explained, "will vary depending on the facts and circumstances of the specific case." *Id.*

Admittedly, *Binay* is not on all fours with this case. In *Binay*, the officers had no reason to suspect the presence of firearms but still detained the residents for more than an hour. *Id.* at 648. Here, as Plaintiff acknowledges, Defendant and his search team *did* suspect that firearms were in the house and detained Plaintiff for only a brief period. *See* ECF No. 8 at PageID.32, 35. Still, the primary allegations are analogous. Like the residents in *Binay*, Plaintiff claims that police held him at gunpoint despite his immediate cooperation and the lack of any reason to believe that he was dangerous. *Compare Binay*, 601 F.3d at 650, *with* ECF No. 8 at PageID.39. And while the police did suspect that firearms were in the house, they had no reason to believe that Plaintiff was armed. Further, some of Plaintiff's allegations are more serious than the allegations in *Binay*. In *Binay*, there was no allegation of battery other than the handcuffing itself. *See Binay*, 601 F.3d at 653. Here, Plaintiff claims that Defendant violently shoved him—a 60-year-old unarmed man—despite knowing that the target of the raid, McMullen, had already been arrested. ECF No. 8 at PageID.35. With *Binay* as the benchmark, Plaintiff's allegations raise a plausible inference of excessive force.

In response to Plaintiff's age and other factors, Defendant asks, "So what?" *See* Def.'s Reply, ECF No. 15 at PageID.144. That Plaintiff is 60 years old, Defendant notes, "does not mean he was not a potential threat." *Id.* Further, Defendant claims that he had "no way of knowing

whether [Plaintiff] was armed or whether the other unsecured individual was armed."[5] *Id.* at PageID.144–45.

Yet in his rush to dismiss Plaintiff's allegations, Defendant seems to overlook the standard of review that applies to his motion. As indicated, in reviewing Plaintiff's Amended Complaint, this Court must accept as true all Plaintiff's well-pleaded allegations and construe them in the light most favorable to him. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, this Court cannot simply credit Defendant's unsworn explanations and summarily dismiss the case. *See id.*; *see also Osberry v. Slusher*, 750 F. App'x 385, 389 (6th Cir. 2018) (noting that in excessive-force case courts "must accept [plaintiff's] version of the arrest as true" at the pleading stage).

Further, the standard for an excessive-force claim is objective. *Binay*, 601 F.3d at 647. The basic question is whether the amount of force used was reasonable under the circumstances. *See id.* at 649–50. Here, it would seem important to know whether Defendant knew that Plaintiff was 60 years old, was unrelated to McMullen, and was only at McMullen's house to complete a carpet-cleaning job. But what Defendant knew at the time of the raid cannot be answered at the pleading stage; it can only be answered after discovery, either at the summary-judgment stage or, if factual disputes remain, at trial. *See Pray v. City of Sandusky*, 49 F.3d 1154, 1160 (6th Cir. 1995) (noting that in excessive-force case "[i]t is for the trier of fact to determine, based on the credibility of the evidence before it, at what point the officers knew or reasonably should have known [of their mistake]").

For these reasons, Plaintiff has plausibly alleged an excessive-force claim against Defendant.

---

[5] By "other unsecured individual," Defendant presumably means the mysterious third person that the man in shorts mentioned. *See* ECF No. 8 at PageID.35.

**ii.**

Plaintiff's second Fourth Amendment theory involves the so-called "knock-and-announce rule." ECF No. 8 at PageID.37. Ordinarily, "[l]aw enforcement officers must knock and announce their presence and authority before entering a residence to execute a warrant." *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003). This requirement "forms a part of the reasonableness inquiry under the Fourth Amendment." *Id.* (quoting *Wilson v. Arkansas*, 514 U.S. 927, 930 (1995)). "In order to justify an unannounced entry into an individual's home, the police must reasonably suspect that, under the circumstances, knocking and announcing their presence would (1) be dangerous or futile, or (2) inhibit effective investigation of the crime." *Ingram v. City of Columbus*, 185 F.3d 579, 588 (6th Cir. 1999) (citing *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)).

Plaintiff argues that Defendant and his search team violated the Fourth Amendment by entering McMullen's house without knocking, because they knew that McMullen had already been arrested. ECF No. 8 at PageID.37–38. Plaintiff explains that even though police obtained a no-knock warrant, their only justification for the no-knock entry was the fear that McMullen would harm officers or destroy evidence. *See id.* at PageID.32 (discussing the warrant application). That justification, Plaintiff reasons, dissipated after McMullen was arrested. *Id.* at PageID.37.

The problem with this theory, as Defendant notes, is that Plaintiff lacks standing to assert a violation of *McMullen's* Fourth Amendment rights. "The [Fourth] Amendment protects persons against unreasonable searches of '*their* persons [and] houses' and thus indicates that the Fourth Amendment is a personal right that must be invoked by an individual." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (emphasis added). "[T]o determine whether [Plaintiff] can claim that [his] Fourth Amendment rights were violated when officers entered the residence, this [C]ourt must

decide whether [he] had 'an expectation of privacy in the place searched, and whether [that] expectation [was] reasonable.'" *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000) (quoting *Carter*, 525 U.S. at 88 (1998)).

In *Pollard*, police arrested two men, Pollard and Rodriguez, after conducting a no-knock raid of a house during a drug sale. *Id.* at 645–46. The house had been leased to a nonparty friend of Pollard. *Id.* at 645. At the trial level, both men unsuccessfully challenged the legality of the search team's entry. *Id.* at 646. On appeal, the Sixth Circuit held that Pollard had standing to challenge the entry because he had a legitimate expectation of privacy in the house, even though he was just a guest. *Id.* at 647. Notably, Pollard had been friends with the lessee for seven years, kept personal belongings in the house, and previously stayed there when the lessee was gone. *Id.* Rodriguez, however, had no legitimate expectation of privacy in the house, because he "had never been [there] before[,] did not know the [lessee]," "did not bring any personal possessions or luggage," and "planned to leave immediately after the cocaine sale." *Id.* at 648.

Here, Plaintiff does not even claim that he had a legitimate expectation of privacy in McMullen's house. But even if he did make such a claim, the facts alleged in the Amended Complaint would not support it. By all appearances, Plaintiff has no relationship with McMullen or his family and had never been to McMullen's house before the raid. *Cf. Pollard*, 215 F.3d at 648. Indeed, the only reason Plaintiff was at McMullen's house the day of the raid was to clean carpet—a purely commercial transaction. *See Carter*, 525 U.S. at 91 (holding that cocaine packagers lacked legitimate expectation of privacy in an apartment given "the purely commercial nature of the transaction engaged . . . , the relatively short period of time on the premises, and the lack of any previous connection between [the packagers] and the householder").

Therefore, the Amended Complaint provides no basis to infer that Plaintiff had a legitimate expectation of privacy in McMullen's house. For this reason, Plaintiff lacks standing to challenge the unannounced entry.

### iii.

In addition to arguing that Plaintiff has failed to state a claim, Defendant asserts qualified immunity. ECF No. 9 at PageID.68–73. Qualified immunity is a judicially crafted doctrine that "shield[s] [government officials] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008). To overcome a defendant's assertion of qualified immunity at the pleading stage, "a plaintiff must plausibly allege facts showing '(1) that the [defendant] violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659–60 (6th Cir. 2021) (quoting *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020)) (internal quotation marks omitted).

As indicated, Plaintiff has plausibly alleged the violation of his Fourth Amendment rights. *See supra* Section III.A.i. Accordingly, the question becomes whether those rights were "clearly established" at the time of the raid.

"A right is clearly established for purposes of overcoming the qualified immunity defense only when 'existing precedent [has] placed the statutory or constitutional question beyond debate,' although [the Sixth Circuit] does not require 'a case directly on point.'" *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 563 U.S. 731, 741 (2011)). Stated differently, "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable

official would have understood that what he is doing violates that right." *Moderwell*, 997 F.3d at 660 (quoting *Ashcroft*, 563 U.S. at 741).

Importantly, "[t]he 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). Indeed, "[t]he Supreme Court has 'repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."'" *Id.* (quoting *Wesby*, 138 S. Ct. at 590).

Given his allegations of being held at gunpoint and gratuitously shoved, Plaintiff has pled the violation of two clearly established rights: (1) the right to be free from the threat of deadly force absent an officer's reasonable fear of danger or flight, and (2) the right to be free from physical force when "unarmed, non-threatening, and compliant." *See Barton v. Martin*, 949 F.3d 938, 954 (6th Cir. 2020) (reversing district court's grant of qualified immunity for officer who threw suspect against cupboard, because reasonable officer would have known not to use such force against suspect who was "unarmed, non-threatening, and compliant"); *Pray v. City of Sandusky*, 49 F.3d 1154, 1160 (6th Cir. 1995) (holding that officers would not be entitled to qualified immunity for forcing innocent bystanders to floor at gunpoint during drug raid if jury found that officers knew "they were in the wrong residence and . . . no threat of danger was involved"); *see also Wright v. City of Euclid*, 962 F.3d 852, 870 (6th Cir. 2020) (reversing district court's grant of qualified immunity for officer who brandished firearm during *Terry* stop, because "it was clearly established as of [November 2016] that brandishing a firearm without a justifiable fear that [plaintiff] was fleeing or dangerous was unreasonable and constituted excessive force").

The Sixth Circuit's decisions in *Pray* and *Barton* are instructive. In *Pray*, police raided a lower duplex unit that they believed was occupied by a suspected drug dealer. *Pray*, 49 F.3d at 1156. In reality, an innocent elderly couple occupied the lower unit; the suspected drug dealer occupied the *upper* duplex unit. *Id.* at 1156–57. During the raid, the police forced the elderly couple to the ground at gunpoint and kept them there while searching the unit for four to five minutes. *Id.* at 1157. The couple sued the officers for excessive force. *Id.* At the summary-judgment stage, the district court denied qualified immunity for the officers. *Id.* On appeal, the Sixth Circuit affirmed. The key question, according to the Sixth Circuit, was *when* "the officers knew or under the circumstances should have known that they were in the wrong residence." *Id.* at 1160. If the officers "did in fact know that they were in the wrong residence and nevertheless physically forced [the elderly couple] to the floor when no threat of danger was involved, then a reasonable officer would know that such conduct would violate the[ir] constitutional rights." *Id.* at 1161. But only the jury could determine what the officers knew at the time of the raid, so qualified immunity was improper at the summary-judgment stage. *See id.* ("At bottom, it is for the trier of fact, not the court, to make credibility determinations with respect to what searches, seizures, and applications of force, if any, took place *after* the [officers] knew or should have known of their mistake . . . .").

In *Barton*, police responded to a call from an animal-control officer that a local man, Barton, had admitted to shooting cats but refused to provide further information. *Barton*, 949 F.3d at 944–45. Roughly eight police officers responded to the call. *Id.* at 945. After the police arrived, Barton passed his identification to the animal-control officer through the screen door on his front porch. *Id.* Apparently fearing that Barton was retreating into the house to get a gun, the police "ripped" the screen door off and "barged" into the house. *Id.* One of the officers found Barton standing in the kitchen with "[nothing] in his hands." *Id.* Despite the lack of any apparent threat,

the officer "threw [Barton] up against the counter like a linebacker" and arrested him. *Id.* Barton sued the officer for excessive force. *Id.* at 946. At the summary-judgment stage, the district court granted the officer qualified immunity, which the Sixth Circuit reversed. *Id.* As the Sixth Circuit explained, Barton's case "[did] not present one of the hazy cases where an officer should be entitled to qualified immunity for making an objectively reasonable mistake." *Id.* at 954. Given that "Barton was unarmed, non-threatening, and compliant," the Sixth Circuit held that "no reasonable officer would find that . . . [Barton's arrest] required the level of force used." *Id.*

The facts that Plaintiff alleges are sufficiently analogous to both *Pray* and *Barton*. Like the police in *Pray*, Defendant allegedly used the threat of deadly force to detain a person that he knew or reasonably should have known posed no risk of danger or flight. *Cf. Pray*, 49 F.3d at 1161. Indeed, according to Plaintiff, Defendant knew that McMullen—the only person who the police might have had reason to fear—had already been arrested, and that Plaintiff was only in the house for a carpet-cleaning job. *See* ECF No. 8 at PageID.38–40. Moreover, like the police in *Barton*, Defendant allegedly used violent force against a person without any reason to believe that he was dangerous, noncompliant, or attempting to flee. *Cf. Barton*, 949 F.3d at 954.     For the same reasons that *Barton* and *Pray* are analogous, the principal case that Defendant relies on, *Marcilis v. Twp. of Redford*, 693 F.3d 589 (6th Cir. 2012), is distinguishable.

In *Marcilis*, police raided two houses owned by two relatives suspected of dealing drugs. *Id.* at 594. Both suspects were home during the raids, and the police expected that both houses would contain firearms, drugs, and other evidence of drug trafficking. *Id.* at 594–95. During the raucous operation, the police forced both suspects and their spouses to the floor at gunpoint and physically pushed one of the suspects, who was visibly bandaged from a prior injury. *Id.* at 594. Given the apparent risks involved in the operation, the Sixth Circuit found that "a reasonable

officer in the police officers' position would have been justifiably concerned with his safety and 'could have believed' that the level of force used was lawful." *Id.* at 599 (quoting *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011)).

Defendant is correct that both *Marcilis* and this case involve drug raids during which officers brandished firearms and used physical force. But that is essentially where the similarities end.

In *Marcilis*, both suspects were home at the time of the raid and presumably had access to firearms and other dangerous weapons. *See id.* at 594. One of the suspects even had a conviction for assaulting a police officer. *Id.* at 599. In those circumstances, the officers could have reasonably believed that the threat of deadly force was a "lawful means of exercising command of the situation." *Id.* Here, by the time police entered the house, they had already arrested the sole suspect, McMullen. *See* ECF No. 8 at PageID.33–35. Further, Plaintiff was neither a suspect of the investigation nor related to one; he was an innocent bystander in a carpter-cleaning uniform whom police saw arrive at McMullen's house in a carpet-cleaning van. *Id.* at PageID.33–34.

To accept Defendant's view of *Marcilis* would be to hold that anytime a police officer is searching a house for drugs or firearms, he may use the threat of deadly force—and actually use physical force—against anyone he finds in the house, regardless of other factors bearing on the threat of danger. Such a rule seems neither consistent with *Marcilis* nor sensible. *See Marcilis*, 693 F.3d at 599 ("[O]fficers conducting residential searches may detain individuals in handcuffs and display firearms *where the officers have a justifiable fear of personal safety*." (emphasis added)).

Of course, this is not to say that either *Pray* and *Barton* is indistinguishable from this case. Indeed, both cases vary in some respects that may prove important once the facts of this case are developed. But not all distinctions between Plaintiff's case and existing precedent are relevant to

qualified immunity. As indicated, the Sixth Circuit has never required a plaintiff to identify a case "directly on point." *Barton*, 949 F.3d at 947 (quoting *Ashcroft*, 563 U.S. at 741). Rather, the basic question is whether "existing precedent . . . placed the statutory or constitutional question beyond debate." *Id.* at 947–48 (quoting *Ashcroft*, 563 U.S. at 741). And for the reasons stated above, existing precedent, particularly *Pray* and *Barton*, should have placed the constitutionality of Defendant's alleged conduct beyond debate.

In declining to grant Defendant qualified immunity, this Court is mindful of the Sixth Circuit's repeated instruction that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *See, e.g.*, *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015); *see also id.* ("Although a defendant's 'entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point,' that point is usually summary judgment and not dismissal under Rule 12.'" (quoting *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)) (internal citation omitted)). For that reason, this Court's holding is limited to Plaintiff's allegations in the Amended Complaint. Defendant is free to assert qualified immunity again at the summary-judgment stage.

## B.

Plaintiff also alleges that Defendant battered him in violation of Michigan law. ECF No. 8 at PageID.40–41. In Michigan, "[a] battery is 'an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person.'" *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009) (quoting *People v. Nickens*, 685 N.W.2d 657, 661 (Mich. 2004)). Naturally, Plaintiff alleges that Defendant's shove was intentional, unconsented, and harmful. *See* ECF No. 8 at PageID.41. Defendant does not deny that his shove

would constitute battery under Michigan law. Instead, he argues that he is entitled to governmental immunity under Michigan Compiled Laws § 691.1407. ECF No. 9 at PageID.75.

As a state employee, Defendant is entitled to governmental immunity for intentional torts if "(1) [he] undertook the challenged acts during the course of his employment and was acting, or reasonably believed that he was acting, within the scope of his authority; (2) [he] undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature." *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011) (citing *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008)).

According to Defendant, it is "undisputed" that he was acting within the scope of his authority and that his actions were discretionary.[6] ECF No. 9 at PageID.76. In his view, the only disputed issue is whether he was acting in good faith. *Id.* And on that issue, he claims that Plaintiff's allegations are too conclusory to raise a reasonable inference of malice. *Id.*

But Plaintiff does not simply *assert* that Defendant acted with malice. Rather, he tells his version of the facts—how he obeyed Defendant's commands, how he commented on Defendant's tone of voice, and how Defendant then shoved him from behind—and draws the inference that Defendant acted maliciously and out of anger. *See* ECF No. 8 at PageID.35, 41. Drawing all reasonable inferences in Plaintiff's favor, as this Court must, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), Plaintiff plausibly alleges that Defendant acted in malice.

Moreover, governmental immunity is an affirmative defense that Defendant bears the burden "to raise and prove." *Odom*, 760 N.W.2d at 227–228; *see also id.* at 225 ("[T]he proponent of [governmental] immunity must establish that he acted without malice."). Defendant has not offered any proof that he acted in good faith. And as explained previously, this Court cannot simply

---

[6] Notably, Plaintiff disputes the third issue—whether Defendant's actions were "discretionary." *See* Pl.'s Resp., ECF No. 13 at PageID.113–14.

credit the unsworn explanations in his briefing. *See Iqbal*, 556 U.S. at 678; *see also Osberry v. Slusher*, 750 F. App'x 385, 389 (6th Cir. 2018).

Because Defendant has not shown that he acted in good faith, his request to dismiss Plaintiff's battery claim based on governmental immunity will be denied. As with qualified immunity, Defendant is free to assert governmental immunity again at the summary-judgment stage.

**IV.**

Accordingly, it is **ORDERED** that Defendant Joshua May's Motion to Dismiss, ECF No. 8, is **GRANTED AND DENIED IN PART**. Defendant's Motion is **GRANTED** as to his request to dismiss Plaintiff's knock-and-announce claim. Defendant's Motion is **DENIED** in all other respects.

Dated: January 28, 2022                                s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge