UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIAM MURPHY,

             Plaintiff,

v.

JOSHUA MAY, et al.,

             Defendants.

_____/

Case No. 1:21-cv-12089

Honorable Thomas L. Ludington
United States District Judge

Honorable Elizabeth A. Stafford
United States Magistrate Judge

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

On August 28, 2020, Plaintiff William Murphy, a 60-year-old carpet cleaner, was working a carpet-cleaning job at a house in Saginaw, Michigan, when police executed a no-knock search warrant. Plaintiff was injured during the search and sued nine of the officers involved, alleging they used excessive force that deprived him of his Fourth Amendment rights in violation of 42 U.S.C. § 1983, that one officer battered him in violation of Michigan law, and that two officers were grossly negligent in assembling the search team. All Defendants have filed motions for summary judgment.

**I.**

Plaintiff William Murphy is a pastor at a small community church in Saginaw, Michigan. ECF No. 88-4 at PageID.1755. He also owns a carpet-cleaning business. *Id.* at PgaeID.1755– 56. On August 28, 2020, he and an employee, Steven Boles, were working a carpet-cleaning job at a house in Saginaw that happened to be the target of a search warrant by the Bay Area Narcotics

Enforcement Team ("BAYANET").[1] *Id.* at PageID.1764; ECF No. 88-2 at PageID.1713. The search warrant documented six risk factors related to the house and the target suspect, including a history of firearms, the use of firearms in committing crimes, difficulties with tactical approach, and a heavily fortified target location. ECF No. 88-2 at PageID.1728. Before executing the search warrant, Defendant James Williams, a Sergeant with the Michigan State Police, authored a "Confidential Operational Plan" (the "Plan"). *Id.* According to the Plan, officers would wait for the target suspect to leave the house and then conduct a traffic stop to detain him. *Id.* Once the target suspect was detained, the search team would execute the search warrant. *Id.* The Plan further noted that the house had surveillance cameras and armor guards on all windows and doors, and that young children would likely be present inside the house. *Id.*

Shortly before the target suspect left the house, Plaintiff arrived to clean the target suspect's carpet. ECF No. 88-4 at PageID.1768–69; *see also* ECF No. 88-2 at PageID.1713. The target suspect left, BAYANET officers initiated the traffic stop and detained him as planned. ECF No. 88-2 at PageID.1732–33. Meanwhile, back at the house, Plaintiff carried his equipment—including two hoses—into the house, sprayed a precleaning spray onto the living room carpet, and was waiting for it to soak in when BAYANET began its search. ECF No. 88-4 at PageID.1768–69; *see also* ECF No. 88-2 at PageID.1713.

Defendant Joshua May, a Michigan State Police (MSP) Trooper, was "asked to assist with the execution of the search warrant as part of the entry team." ECF No. 88-2 at PageID.1713. Defendant May was assigned to act as a "hook" and use law-enforcement equipment to open locked doors. ECF No. 110 at PageID.2409. But because Plaintiff's "large 3-4 inch hose" was

---

[1] BAYANET is "a multijurisdictional taskforce overseen by the Michigan State Police." *Murphy v. May*, No. 1:21-CV-12089, 2022 WL 275560, at *1 (E.D. Mich. Jan. 28, 2022).

propping the back door open, there was no need for "hook" equipment. *Id.* at PageID.2424–25. So, Defendant May held the door open for the rest of entry team, *id.* at PageID.2425, and then "fell in behind the team," with his handgun pointed toward the ground. ECF No. 88-2 at PageID.1715. After the officers entered the house through the back door, they cleared two of the ground-level rooms. ECF No. 110 at PageID.2426. Then, a woman called out to the officers that she was in the third ground-level room with children. *Id.*; *see also* ECF No. 88-2 at PageID.1715, 1730. Defendant May determined that the other officers "had that [third ground-level room] covered," because it was a "small room" with "enough guys" to handle the situation, so he decided, based on his training, to help secure the rest of the house. ECF No. 110 at PageID.2426.

From the ground floor, Defendant May stepped up two or three steps onto an interior porch[2] with a door that opened into a small laundry-room area. *See* ECF Nos. 88-2 at PageID.1723; 110 at PageID.2427. On one side of the laundry area were stairs leading to the second floor, and on the other side of the laundry area was "a small, narrow kitchen," that Defendant May thought "lead[]" around to the . . . living room or living area of the house." ECF No. 110 at PageID.2427; *see also* ECF No. 88-2 at PageID.1723–24. Once standing by the door separating the interior porch and the laundry area, Defendant May decided to wait there until a shield team officer was "available to take the lead again." ECF No. 110 at PageID.2428. While waiting for a shield team officer to take the lead, Defendant May announced the officers' presence and purpose, *see id.* ("State Police! Search warrant!") and directed anyone in the house "to come to the sound of [his] voice," as he

---

[2] All Parties agree the layout of the house was "strange." ECF No. 110 at PageID.2427. What will be referred to throughout this Opinion as the "interior porch" was described by Plaintiff as a "three to four foot ledge, with about three or four stair[s]" leading into the small laundry area. ECF No. 88-4 at PageID.1769. According to the MSP report, the ground floor area was "an addition to the original domicile," and the interior porch appeared to have originally been a porch leading to the exterior of the house, before the addition was built. ECF No. 88-2 at PageID.1715.

had been trained to do. *Id.*

In response to Defendant May's announcement, a shirtless "young man"—later identified as Scintayvian McMullen—appeared in the kitchen with his hands up. *Id.* at PageID.2428–29. Defendant May asked McMullen how many people were inside, and McMullen replied that there were three people inside. *Id.* at PageID.2429. Defendant May directed McMullen to walk toward him, through the door, and down the interior porch steps to the ground level. *Id.* McMullen complied with Defendant May's orders and Defendant May determined McMullen "was a low threat at that point." *Id.*

After McMullen descended the interior porch steps to the ground level, Defendant May observed two other men walk into the kitchen, at least one of whom was wearing a shirt with the name of Plaintiff's carpet-cleaning business on it. *Id.* At this point, Plaintiff's and Defendant May's stories diverge.

According to Defendant May, although Plaintiff initially complied with his commands to exit the house, when Plaintiff was halfway through the narrow kitchen, he stopped complying, "started to turn back[,] and said 'uh uh I'm just the carpet cleaner, I ain't coming out there!'" ECF No. 90-3 at PageID.1972; *see also* ECF No. 110 at PageID.2431 (alleging Plaintiff said "something to the effect of 'I'm just a cleaner. I'm not going to do this.'"). In response, Defendant May holstered his handgun, which he alleges had been pointed at the ground the whole time, *see* ECF Nos. 90-2 at PageID.1932; 110 at PageID.2435, "grabbed [Plaintiff's] left elbow and ordered him to move out the back door," but Plaintiff "actively resisted by pulling away." ECF No. 90-3 at PageID.1972. Defendant May responded "by securing [Plaintiff's] right elbow and physically pull[ing Plaintiff] toward the doorway." *Id.* While Defendant May was "physically direct[ing]" Plaintiff "toward the back door" Plaintiff "tripped over the [carpet-cleaning] hose in the kitchen

doorway." *Id.* at this point, Defendant May "lost positive control" of Plaintiff, and Plaintiff "fell toward the door, tripping again over the hose [i]n the second doorway." *Id.* After Plaintiff tripped over the hose a second time, he "fell awkwardly" off the interior porch "and landed without an ability to catch or break his fall." *Id.* Defendant May then "grabbed" Plaintiff's employee, Steven Boles, "placed him in the door and ordered him to wait for officers," before "follow[ing]" Plaintiff to the ground-level floor, where Defendant May "asked him to put his hands behind his back." *Id.* Defendant May reports that Plaintiff "refused and passively resisted, complaining about his shoulder." *Id.* Defendant May repeatedly asked Plaintiff to put his hands behind his back and began stringing three sets of handcuffs together, placing one cuff around one of Plaintiff's wrists. *Id.* Plaintiff complained of head and neck pain, as well as discomfort caused by the handcuffs, so Defendant Bush removed his handcuffs. *Id.* The officers called an ambulance, which arrived at approximately 11:30 AM." *Id.*

Plaintiff, however, tells it differently. According to Plaintiff, after he heard and saw the police in the house, he started walking from the living room toward the kitchen with his hands up. ECF No. 88-4 at PageID.1771. Plaintiff told Defendant May that he and Boles were there to clean the carpet and were "waiting on directions" from Defendant May, *id.* at PageID.1772. Although he was waiting for directions, Plaintiff doesn't "remember stopping," and notes that Defendant May "was screaming" at him to move while pointing a "rifle" at him, so he didn't stop moving through the kitchen toward the door. *Id.* at PageID.1776–77. As Plaintiff was walking through the kitchen, he told Defendant May "that he didn't have to holler, don't be hollering at me." *Id.* Afterwards, as Plaintiff was "going past the door" between the kitchen and the laundry area, and was "getting ready to go down the stairs," *id.* at PageID.1778, Defendant May "hit [Plaintiff] from the back[.]" *Id.* at PageID.1777. The impact from Defendant May's hit caused Plaintiff to fall off

the interior porch, hit his legs on the stairs, and land on his stomach on the ground-level floor. *Id.* at PageID.1782, 1862. Shortly after Plaintiff hit the floor, Defendant May "landed on his back," placed a knee on his back, and "told [Plaintiff] to shut up." *Id.* at PageID.1782, 1874. Defendant May began handcuffing Plaintiff with another officer's assistance, *id.* at PageID.1782, but Plaintiff complained that he was hurt, and after putting a handcuff on only one of Plaintiff's wrists, the officers stopped handcuffing Plaintiff and "picked [him] up[.]" *Id.* at PageID.1783. Plaintiff reported neck and back pain, as well as numb toes. *Id.* at PageID.1785. One of the officers called an ambulance to the house, and as Plaintiff was waiting for the ambulance to arrive, Defendant May "told him loudly to 'watch [his] words!'" ECF No. 88-2 at PageID.1719. Plaintiff was taken to the local hospital where tests were performed and he stayed overnight. ECF No. 88-4 at PageID.1787–88. An MRI revealed a "soft tissue ligamentous injury, particularly through C5 thru C7 levels." ECF No. 96-7 at PageID.2297. After leaving the hospital, Plaintiff wore a neck brace upon the doctor's recommendation and attended physical therapy through October 2020. *Id.* Since the fall, Plaintiff continues to experience neck and back pain, and doctors noted the ligamentous damage is "unlikely to heal completely." *Id.*

Six weeks after the incident, Plaintiff filed a citizen complaint with the MSP about the incident which triggered an internal investigation. ECF No. 88-2 at PageID.1714. Specialist Lieutenant Jennifer Pintar, of the MSP's professional standards section led the investigation, and interviewed nineteen witnesses in the process of preparing a 30-page internal affairs report. *See generally* ECF No. 88-2.

Plaintiff then sued Defendant May, and eight other BAYANET officers involved in the execution of the search warrant.[3] ECF No. 29. He brings § 1983 claims of excessive force against

---

[3] One Defendant, Michael Bess, has since been dismissed by stipulation. ECF No. 71.

all Defendants, a claim of battery against Defendant May, and claims of gross negligence against two BAYANET officers in charge of the search. *Id.* at PageID.393–401. All Defendants now seek summary judgment on all Plaintiff's claims. ECF Nos. 88; 90.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of "identifying" the record evidence "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). A genuine issue of fact requires more than "a mere scintilla of evidence," *id.* at 251, more than "some metaphysical doubt," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Throughout its analysis, the court must draw all reasonable inferences in favor of the nonmovant to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Summary judgment will be granted if the nonmovant fails to establish a genuine issue of material fact on the elements of its case that the moving party has challenged. *See Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied if the challenged elements have "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

### III.

Plaintiff alleges that all Defendants used excessive force in violation of the Fourth Amendment, Defendant May battered him in violation of Michigan law, and Defendants Williams and Larrison were grossly negligent in violation of Michigan law. ECF No. 29 at PageID.393–401. Each allegation will be addressed in turn.

### A. Excessive Force

Plaintiff alleges that Defendant May deprived him of his Fourth Amendment rights in violation of 42 U.S.C. § 1983 by using excessive force three times during the execution of a search warrant: (1) when Defendant May displayed a gun and pointed it at Plaintiff; (2) when Defendant May pushed him; and (3) when Defendant May handcuffed him after he fell off the interior porch. ECF No. 29 at PageID.396–97. Further, Plaintiff alleges other officer-defendants deprived him of his Fourth Amendment rights by failing to intervene when Defendant May pushed him and again when Defendant May was handcuffing him. *Id.* at PageID.397. Each instance of alleged excessive force requires its own discussion.

In order to prevail on a 42 U.S.C. § 1983 claim, a plaintiff must prove that he was deprived of a "a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Plaintiff's excessive force § 1983 claims are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Fourth Amendment guarantees the right of persons to be free from "unreasonable searches and seizures." U.S. CONST. amend. IV. "The use of excessive force in the execution of a search warrant constitutes a Fourth Amendment violation." *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010).

"To determine whether a constitutional violation based on excessive force has occurred, [the Sixth Circuit] applies 'the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight.'" *Id.* (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)). "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

But, under the doctrine of qualified immunity, even if a government official uses excessive force in violation of the Fourth Amendment, they may be shielded from liability for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)) (internal quotations omitted); *see also Pearson v. Callahan,* 555 U.S. 223, 232 (2009). Qualified immunity provides "breathing room [to officers who] make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (cleaned up) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Courts must evaluate "the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007). Importantly, "[e]ach Defendant's liability must be assessed individually based on his or her own actions." *Pollard v. City of Columbus*, F.3d 395, 402 (6th Cir. 2015).

At its core, qualified immunity depends on (1) whether there was a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the violation. When evaluating whether a defendant is entitled to qualified immunity, courts need not proceed in a particular order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no longer be treated as mandatory.").

### 1. The Gun Pointing

Plaintiff first alleges that Defendant May used excessive force against Plaintiff by "[b]randishing a weapon in his presence" and "[t]raining a weapon on him" during the execution of the search warrant. ECF No. 29 at PageID.396. Notably, whether Defendant pointed his gun at Plaintiff remains a question of fact. Defendant maintains he did not point his gun at Plaintiff. *See* ECF No. 90-2 at PageID.1932 (averring his handgun was "pointed at the floor" during his interaction with Plaintiff until he "holstered" it to use both hands to make contact with Plaintiff to move him towards the exit.); *see also* ECF No. 110 at PageID.2435–36 (same). But Plaintiff maintains that Defendant May pointed a gun at him and that he "remember[ed] it being a rifle." ECF No. 88-4 at PageID.1777. Nonetheless, Defendant May argues that his *display* of a gun during the search did not violate a constitutional right because it was reasonable under the circumstances. ECF No. 90 at PageID.1905–10. And he argues that even if he did *point* his gun at Plaintiff, it was also reasonable under the circumstances. *Id.*

Officers may display firearms while executing a search warrant when they have a justifiable fear of personal safety. *Marcilis v. Twp. Of Redford*, 693 F.3d 589, 599 (2012). But "an officer's display of a weapon may be excessive if at the time force was used the officer had readily determined that there was no risk of danger or flight." *Simpson v. Rivera*, No. 1:20-CV-02478, 2023 WL 2585478, at *11 (N.D. Ohio Mar. 21, 2023) (collecting cases).

Under the circumstances here, Defendant May's *display* of a firearm is reasonable, thus not a constitutional violation under the Fourth Amendment excessive force framework. The relevant search warrant identified several risk factors before the search, including the known presence of firearms in the house, which the target suspect confirmed shortly before the search team entered the house. *See* ECF No. 88-2 at PageID.1728. Moreover, Defendant May was the only officer in an area of the house that was not yet fully cleared, knew that other people were in the house but did not know whether these people posed a threat. *See* ECF No. 110 at PageID.2432. Under such circumstances, Defendant May had a justifiable fear of personal safety, thus his *display* of a weapon was reasonable under the circumstances and was, thus, not violative of the Fourth Amendment. *Marcilis v. Twp. Of Redford*, 693 F.3d 589, 599 (2012).

And assuming Defendant May *did* point his gun at Plaintiff, the brief[4] *pointing* of a gun at Plaintiff was reasonable under the circumstances here where Plaintiff posed an unknown threat to Defendant May such that any gun pointing is not a constitutional violation under the Fourth Amendment excessive force framework.

"[P]ointing a firearm at an individual ... is more than merely displaying a firearm with an intent to intimidate (i.e., brandishing) because by pointing a firearm at an individual and making a demand of that individual, a defendant communicates the implicit threat that if the individual does

---

[4] Although there is no explicit statement in the record addressing *how long* Defendant May might have pointed his gun at Plaintiff, considering all other record evidence regarding timing, no reasonable juror could find Defendant May pointed his gun at Plaintiff for more than a few minutes. BAYANET began executing the search warrant at 11:17 AM, ECF No. 90-3 at PageID.1952, and an ambulance arrived to evaluate Plaintiff at 11:30 AM, ECF No. 90-3 at PageID.1972, leaving 13 minutes unaccounted for. But the record establishes that Plaintiff was sitting with one handcuff on his wrist for *at least* ten of those minutes while officers searched for the correct key to remove the single handcuff. *See* ECF No. 88-2 at PageID.1719 (stating it took "approximately ten minutes" to locate the key to remove the handcuffs); 88-4 at PageID.1870 (stating it took "about 15 to 20 minutes" to remove the handcuff), at PageID.1783 (stating it took 30 minutes to get the handcuff off).

not comply with the defendant's demands, the defendant will shoot the individual." *United States v. Bolden*, 479 F.3d 455, 461 (6th Cir. 2007). Accordingly, the Sixth Circuit has held that pointing a gun at an individual under certain circumstances can constitute excessive force in violation of the Fourth Amendment. *See, e.g.*, *Binay v. Bettendorf*, 601 F.3d 640, 649-650 (6th Cir. 2010) (finding that pointing a gun at a plaintiff who "had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee" constituted excessive force); *Vanderhoef v. Dixon*, 938 F.3d 271, 277-78 (6th Cir. 2019) (finding that ordering "three unarmed and nonthreatening teens exit[ing] [a] damaged vehicle" to the ground at gunpoint violated their constitutional rights). On the one hand, Defendant May knew the target suspect had already been arrested, could see Plaintiff's shirt identifying him as a carpet cleaner, and "didn't see anything crazy." ECF No. 110 at PageID.2431. But, on the other hand, Defendant May was the only officer in the room with two unidentified people and he saw that Plaintiff was "a very big guy," *id.* at PageID.2432. Moreover, Defendant May "still [didn't] know what was behind" Plaintiff, as the rest of the house had not been cleared, *id.* at PageID.2431. In sum, at the time, Plaintiff "posed an unknown threat" to Defendant May such that pointing a gun at Plaintiff for, at most, a couple minutes, was reasonable under the circumstances. *Brown v. City of Wyoming*, 658 F. Supp. 3d 546, 567 (W.D. Mich. 2023). Thus, Defendant May did not use excessive force in violation of the Fourth Amendment when pointing his gun at Plaintiff, so summary judgment will be granted in favor of Defendant May on Plaintiff's excessive force claim relating to the display and pointing of a gun.

**2. The Push**

**a.**

Plaintiff next alleges Defendant May used excessive force when he pushed Plaintiff, causing him to trip over the carpet-cleaning hose and fall off the interior porch. ECF No. 29 at PageID.396. Defendant asserts "a single push" is not excessive force, ECF No. 90 at PageID.1910, and that even if it is, a single push is not "unreasonable" under the circumstances. ECF No. 90 at PageID.1910. Plaintiff responds that he was "unarmed, nonthreatening and compliant," making the push unreasonable. ECF No. 96 at PageID.2235.

Importantly, Defendant May admits that he pushed Plaintiff. *See* ECF Nos. 88-2 at PageID.1716 ("Based on [Plaintiff's] active resistance, I responded with compliance controls by securing his right elbow and physically pulled him towards the doorway…[a]s I physically directed him toward the back door, and he actively resisted, [Plaintiff] tripped over the hose in the kitchen doorway."); 110 at PageID.2439–40 ("I kind of pull on his arm and push on his shoulder"), *id.* at PageID.2444 ("[I]t's very possible [Plaintiff's fall] was from the momentum I was providing him because he was refusing to go to the door."). The crux of the factual dispute between the Parties on this issue is what happened *before* the push.

Plaintiff alleges he was complying with Defendant May's commands to exit the house, had walked past Defendant May, and was "getting ready to go down the stairs" when Defendant May pushed him. ECF No. 88-4 at PageID.1778–79 ("When he was telling me to move it, get going, I was walking away, and I told him he didn't have to holler . . . that's when he hit me from the back. I didn't see him coming."), at PageID.1856 ("So when [the officers] were clearing the house out I started walking . . . towards the entranceway to, you know, to leave out . . . 'cause they were clearing the house out[.]"), at PageID.1861 ("I walked past [Defendant] May."). Plaintiff's version

of the facts appears to be supported by statements made to Lieutenant Pintar in the course of the MSP's internal-affairs investigation by Defendant Bledsoe[5] and Scintayvian McMullen.[6] *See* ECF No. 88-2 at PageID.1736 ("[Plaintiff] was not resisting, he was 'shuffling' out the door."), at PageID.1731 ("contend[ing] that [Plaintiff] was walking forward with the officer behind him" when Defendant May pushed Plaintiff).

Defendant May, on the other hand, alleges that Plaintiff was *not* complying with his commands to exit the house and that Plaintiff said "something to [the] effect" of "I'm not going out there." ECF No. 110 at PageID.2449 (noting that "initially, the resistance was simply ignoring [Defendant May's] commands," but that Plaintiff then "turned away to go back into the house."). According to Defendant May, after he placed his hands on Plaintiff to steer him out of the house, Plaintiff began to "verbalize" that he was complying with Defendant May's command to exit the house, but "physically, [Plaintiff was] pushing against what [Defendant May was] trying to get him to do." *Id.* at PageID.2450. *See also* ECF No. 88-2 at PageID.1716 (noting that Plaintiff "initially complied while walking through the kitchen…loudly stated several times 'I'm the carpet cleaner'. . . [but] [a]fter making it part way through the kitchen . . . [Plaintiff] started to turn back and said 'uh uh I'm just the carpet cleaner, I ain't coming out there!'"). Defendant May's version of the facts appear to be supported by statements made to Lieutenant Pintar during the MSP's internal-affairs investigation by Defendant Trafelet,[7] *see* ECF No. 88-2 at PageID.1734 (reporting

---

[5] Defendant Bledsoe saw Plaintiff for "a brief second" while he was "posted on a staircase." ECF No. 88-2 at PageID.1736.
[6] Scintayvian McMullen saw Plaintiff while he was being handcuffed at the bottom of the stairs. ECF No. 88-2 at PageID.1731.
[7] Defendant Trafelet was handcuffing and removing another person from the house when he heard the "commotion." ECF No. 88-2 at PageID.1734.

he heard Plaintiff yell "[g]et your hands off me."), Defendant Bledsoe,[8] *id.* at PageID.1735 (reporting he heard a "commotion" and that someone said "he was not going back there or I am not coming back there."), and previously-dismissed Defendant Bess,[9] *id.* at PageID.1736 (reporting that Plaintiff "turned his back to [Defendant May] and started to walk away as if to start cleaning up his equipment to leave" and describing Plaintiff as "half cooperative but also upset that he couldn't get his equipment.").

At this juncture, it is impossible to evaluate the reasonableness of Defendant May's use of force without first resolving the factual dispute of whether Plaintiff was complying with Defendant May's commands before Defendant May pushed him. If Plaintiff *was* complying with Defendant May's commands, Defendant May's contact with Plaintiff would likely be unreasonable. *See Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (finding officer's use of force was "objectively *unreasonable*" where there was "no evidence that plaintiff . . . did anything but comply completely with [the officer's] demands" and "no evidence whatsoever that anyone attempted to flee." (emphasis in original)). But, if Plaintiff was *not* complying with Defendant May's commands and appeared to be actively resisting or fleeing, Defendant May's contact is more likely reasonable. *See Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 96 (6th Cir. 2012) (finding officer's use of taser was not excessive force when Plaintiff was uncooperative and attempting to run away). But whether Plaintiff was complaint before Defendant May used force is a factual dispute for the jury to resolve, so summary judgment will be denied as to Plaintiff's claim of excessive force against Defendant May for the push.

---

[8] Defendant Bledsoe saw Plaintiff for "a brief second" while he was "posted on a staircase." ECF No. 88-2 at PageID.1736.
[9] Previously-dismissed Defendant Bess "was the first officer to enter the residence" and observed the interaction between Plaintiff and Defendant May. ECF No. 88-2 at PageID.1736.

Moreover, Defendant May is not entitled to qualified immunity at this juncture, because there is a question of fact—Plaintiff's compliance—that prevents this Court from assessing the reasonableness of Defendant May's actions, an assessment that is necessary to determine whether or not Defendant May used excessive force in violation of the Fourth Amendment. Thus, Defendant May may not succeed in clearing the first prong of the qualified-immunity analysis at this point—whether a constitutional violation occurred. And the same factual question regarding Plaintiff's compliance prevents Defendant May from clearing the second prong of the qualified immunity analysis—whether the right at issue was clearly established at the time of his alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223. 232 (2009); *see also Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) ("We further note that the two officers' actions violated a clearly established right: the right of a suspect to be free from the use of physical force when he is not resisting police efforts to apprehend him." (collecting cases)).

### b. Failure to Intervene: The Push

Plaintiff also alleges that Defendants Bush and Rutledge should be liable for failing to intervene when Defendant May pushed Plaintiff because both Defendants had the opportunity and means "to prevent [Plaintiff] from landing awkwardly and uncontrolled as he did and [could have] mitigated his injury." ECF No. 29 at PageID.397 (quotation marks omitted).

A defendant may only be liable for excessive force in violation of the Fourth Amendment under a failure-to-intervene theory if (1) "the officer observed or had reason to know that excessive force would be or was being used," and (2) "the officer had both the opportunity and the means to prevent the harm from occurring." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 946 (6th Cir. 2017) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

- 16 -

Defendant Rutledge argues he is entitled to qualified immunity because he did not observe the excessive force being used and did not have the opportunity or means to stop it. ECF No. 88 at PageID.1705. Similarly, Defendant Bush argues he is entitled to qualified immunity because "a single push and immediate fall would not have given [him] time to perceive anything, let alone intervene." ECF No. 90 at PageID.1916.

At the time Defendant May pushed Plaintiff, Defendants Bush and Rutledge were both in entirely different rooms and thus did not observe the push or have the opportunity and means to prevent the harm from occurring. Defendant Bush "was handcuffing one of the occupants when he heard 'screaming,'" followed by Plaintiff falling off the porch, almost on top of himself and Defendant Trafelet. ECF No. 88-2 at PageID.1735. This was the first time Defendant Bush saw Plaintiff. *Id.* And Defendant Rutledge "had not entered yet" the area of the house where Plaintiff and Defendant May were when he heard a "commotion" coming from upstairs. ECF No. 88-2 at PageID.1737. "The next thing he recalled was [Plaintiff] falling on top of him, hitting him on the head, and then continuing to fall to the ground." *Id.* Defendant Rutledge reported to Internal Affairs that he was surprised by the contact and did not see what caused Plaintiff to fall. *Id.* And Plaintiff has provided no evidence to the contrary. *See generally* ECF Nos. 96; 99. In this way, there is no question of fact that neither Defendant Bush nor Defendant Rutledge observed the push, nor did either have the opportunity and means to stop it. And to the extent Plaintiff argues these Defendants should have intervened by acting "to prevent [Plaintiff] from landing awkwardly" and uncontrollably, ECF No. 29 at PageID.397, even if such a duty did exist, the push and fall happened within the span of a few seconds—Plaintiff himself stated he did not have time to catch himself after he was pushed, *see* ECF No. 88-4 at PageID.1787—so neither Defendant had enough time to perceive the incident to catch Plaintiff. *See Alexander v. Carter for Byrd*, 733 Fed. Appx. 256, 265

(6th Cir. 2018) (holding that when "an act of excessive force unfolds in a matter of seconds, the second requirement is generally not satisfied.").

In sum, the record is clear that Defendants Bush and Rutledge did not have the opportunity or means to intervene, thus they did not violate Plaintiff's Fourth Amendment rights. Accordingly, Plaintiff's failure-to-intervene claims against them regarding the push will be dismissed.

### 3. The Handcuffing

#### a.

Next, Plaintiff alleges Defendant May used excessive force by "handcuffing him after his fall," applying the handcuffs too tightly, and not removing the handcuffs after Plaintiff complained they were too tight and causing him injury. ECF No. 29 at PageID.396–97.

#### i.

In addition to the general Fourth Amendment excessive-force inquiry, *see supra*, Part III, Sec. A, there is an additional test applied to claims that handcuffs were applied too tightly. The Sixth Circuit has "articulated a three-part test for ascertaining whether 'unduly tight or excessively forceful handcuffing' constitutes excessive force." *Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021) (quoting *Morrison v. Bd. Of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009). To survive summary judgment on a too-tight handcuffing claim, a plaintiff must show there is a genuine dispute of material fact that "(1) [they] complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Morrison*, 583 F.3d at 401. Importantly, the Sixth Circuit has made clear that this test applies "to one specific act" only: "a law-enforcement official's allegedly placing too-tight handcuffs on a person's wrist." *Hughey*, 3 F.4th at 289. All other allegations of excessive force related to the handcuffing process are analyzed under the general Fourth Amendment

- 18 -

excessive force framework. *Id.* Accordingly, Plaintiff's claims that Defendant May applied the handcuffs too tightly and that Defendant May failed to immediately remove the handcuffs after he complained they were too tight, *see* ECF No. 29 at PageID.396–97, are analyzed under the too-tight handcuffing framework, but his claim that handcuffing him, generally, was excessive force, *id.* at PageID.396, is analyzed under the general Fourth Amendment excessive-force framework.

### ii.

Plaintiff's too-tight handcuffing claims will be dismissed because there is no question of fact that Defendants did not ignore Plaintiff's complaints that the handcuff was too tight. Plaintiff himself admits he complained about pain after the officers placed a single cuff around one of his hands, and that in response, the officers "discontinued the handcuffing." ECF No. 88-4 at PageID.1868; *see also* ECF No. 88-2 at PageID.1719 ("[Plaintiff] stated he had one handcuff on."). As Plaintiff describes it, he "let [the officers] know" that the handcuffs were cutting him, "so [the officers] voluntarily tried to" remove the handcuff. *Id.* at PageID.1869; *see also* ECF No. 90-3 at PageID.1972 ("[Plaintiff] complained of discomfort, so D/Sgt Bush removed his handcuffs."). True, the officers were unable to locate the correct handcuff key immediately and had to try several different keys before they were able to remove the handcuff. *See* ECF No. 88-4 at PageID.1870. But they removed the *single handcuff* as soon as they located the correct key,[10] *id.* and during that timeframe, the officers were searching for the key and *stopped* the handcuffing process so that it was never completed. *Id.*; *see also* ECF No. 88-2 at PageID.1719. Indeed, Plaintiff admits a

---

[10] Although there is conflicting evidence regarding how long it took the officers to locate the correct key, *see* ECF No. 88-2 at PageID.1719 (stating it took "approximately ten minutes" to locate the key to remove the handcuffs); 88-4 at PageID.1870 (stating it took "about 15 to 20 minutes" to remove the handcuff), at PageID.1783 (stating it took 30 minutes to get the handcuff off), the length of time it took the officers to find the correct key, especially when considering they tried numerous keys, *see* ECF No. 88-4 at PageID.1870, does not suggest the officers were *ignoring* Plaintiff's complaint about the handcuff being too tight.

handcuff was placed only on one of his wrists. *See* ECF No. 88-2 at PageID.1719. These facts, taken together, establish that Defendant May and other officers did not ignore Plaintiff's complaints about the single handcuff being too tight. Thus, Plaintiff's too-tight handcuffing claim will be dismissed with prejudice.

But Plaintiff's claim that Defendant May's decision to "handcuff[ Plaintiff] after his fall" was excessive force is a closer question. ECF No. 29 at PageID.396–97. "The use of handcuffs is [a] use of force, and such force must be objectively reasonable under the circumstances." *Muehler v. Mena*, 544 U.S. 93, 103 (2005) (Kennedy, J., concurring).

But "the rationale behind the limited authority to detain the occupants of a premises during a proper search [is] to prevent flight and minimize the risk to the officers." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Hill v. McIntyre*, 884 F.2d 271, 277 (6th Cir. 1989). Here, there are questions of fact regarding whether Plaintiff was attempting to flee or was a risk to officers *before* Defendant May pushed him. *See supra* Section III.A.2.a. And there are similar questions of fact about whether Plaintiff—a 60-year-old, 290-pound man—was attempting to flee or was a risk *after* he fell off the interior porch and was lying face down on the ground. This analysis depends, in part, on the resolution of the factual question about what transpired between Plaintiff and Defendant May seconds before Plaintiff was pushed and fell off the interior porch. Thus, Plaintiff's claim that Defendant May used excessive force by handcuffing him after falling off the interior porch will survive summary judgment.

And, like Plaintiff's excessive-force claim against Defendant May related to the gun pointing and the push, Defendant May has not shown he is entitled to qualified immunity because this Court may not faithfully apply the qualified-immunity test when the facts of Plaintiff's

compliance are contested. And resolution of this factual question is necessary to determine whether a constitutional violation occurred and, if so, what clearly established law applies.

### b. Failure to Intervene: The Handcuffing

Plaintiff argues Defendants Bush, Bledsoe, Kearns, Larrison, Rutledge, and Trafelet are all liable for excessive force because they failed to intervene by not stopping the handcuffing of Plaintiff after he fell off the interior porch. ECF No. 29 at PageID.397.

As stated above, a defendant may only be liable for excessive force in violation of the Fourth Amendment under a failure-to-intervene theory if (1) "the officer observed or had reason to know that excessive force would be or was being used," and (2) "the officer had both the opportunity and the means to prevent the harm from occurring." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 946 (6th Cir. 2017) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Plaintiff's handcuffing claim will survive summary judgment because there is a question of fact. *See supra* Section III.A.3.a. But even *assuming* a constitutional violation, some Defendants may be dismissed under Plaintiff's failure-to-intervene theory because there is no question of fact that they did not observe or have reason to know that the handcuffing was occurring and did not have the opportunity and means to prevent the handcuffing from occurring. *Batson v.* Hoover, 788 Fed. Appx. 1017, 1021 (6th Cir. 2019).

The record is clear that Defendants Bledsoe, Kearns, Larrison, and Rutledge were in different areas of the house performing different duties when Defendant May was handcuffing and did not have the opportunity or means to prevent the handcuffing, thus they may not be liable for failing to intervene. Defendants Bledsoe and Kearns were clearing a different area of the house when the fall and handcuffing occurred. *See* ECF No. 88-2 at PageID.1729 ("[Defendant Kearns] made entry into the home, but he did not witness the interaction between [Plaintiff] and [Defendant

May] because he was securing a different area of the house" and had no interaction with Plaintiff), at PageID.1735–36 (noting Defendants Bledsoe and Kearns "were posted on a staircase when [Bledsoe] saw [Plaintiff] for a brief second" before the push and fall and that "[t]he next time [Defendant Bledsoe] saw [Plaintiff] was after the house was secured and [Plaintiff] was sitting on a bench outside the residence"). Similarly, though Defendants Ruteledge and Larrison were closer to Plaintiff and Defendant May after Plaintiff fell off the interior porch, both were preoccupied with their roles in clearing the house to execute their search warrant while the handcuffing occurred, thus they did not have the opportunity or means to intervene. Defendant Larrison was inside a ground-floor bedroom supervising two children while the house was being cleared. ECF No. 88-2 at PageID.1721. Although he witnessed the fall, he could not have intervened during the handcuffing because he was responsible for the two children in the home. And Defendant Rutledge, who was hit by Plaintiff as he was falling, moved on to continue to clear the rest of the house after Plaintiff hit him and fell off the porch. *See* ECF No. 88-2 at PageID.1737.

But Defendants Bush and Trafelet will remain. Assuming a constitutional violation— which still hinges on the factual question of Plaintiff's compliance—these two Defendants *could* be liable for failing to intervene because the record suggests they were all present to observe the handcuffing after Plaintiff landed on the ground floor and had the opportunity and means to intervene, as they had the opportunity and means to assist in the handcuffing. *See* ECF No. 88-2 at PageID.1734 ("Once [Plaintiff] landed on the ground level, [Defendants] Trafelet and Bush helped [Plaintiff] up and checked to see if he was injured."), at PageID.1735 (noting Plaintiff "almost fell on top of" Defendants Trafelet and Bush and that Defendant Bush "assisted [Defendant] May with handcuffing [Plaintiff] using two sets of handcuffs, and helped [Plaintiff] to his feet.").

In sum, the only Defendants that may be liable for failing to intervene depending on the resolution of the factual question of Plaintiff's compliance are Defendant Bush and Defendant Trafelet. All other officer Defendants are not liable because, as the record clearly establishes, they did not have the opportunity or means to intervene, so Plaintiff's failure-to-intervene claims against them will be dismissed with prejudice.

### B. Battery

The next issue is Plaintiff's battery claim against Defendant May. ECF No. 29 at PageID.397–98. Defendant May argues his conduct was reasonable under the circumstances to achieve a legitimate law enforcement purpose, so he is entitled to governmental immunity for Plaintiff's intentional tort claim. ECF No. 90 at PageID.1921–22. Plaintiff responds that there is a question of fact as to whether Defendant May's conduct was reasonable considering the factual question of what transpired between Plaintiff and Defendant May before Defendant May pushed him. ECF No. 96 at PageID.2239.

"[U]nder Michigan law, an assault and battery claim against a police officer requires proof that the officer's actions 'were not justified because they were not objectively reasonable under the circumstances.'" *Bell v. Porter*, 739 F.Supp.2d 1005, 1015 (W.D. Mich. 2010) (citing *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004) (overruled on other grounds by *Odom v. Wayne County*, 760 N.W.2d 217 (Mich. 2008))); *see also Acklin v. Inkster*, 93 F.Supp.3d 778 (E.D. Mich. 2015) (finding plaintiff could proceed with his assault and battery claim where officer conduct was objectively unreasonable).

But "government actors may find it necessary—and are permitted—to act in ways that would, under different circumstances, subject them to liability for an intentional tort." *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004) (overruled on other grounds by *Odom*

*v. Wayne County*, 760 N.W.2d 217 (Mich. 2008))). "To be entitled to governmental immunity for an intentional tort under Michigan law, an officer must establish that (1) he was acting in course of his employment and at least reasonably believed that he was acting within scope of his authority, (2) that his actions were discretionary in nature, and (3) that he acted in good faith." *Odom v. Wayne Co.*, 760 N.W.2d 217 at 228-29 (Mich. 2008).

"Unlike federal law, governmental immunity in Michigan is "subjective in nature." *Smith v. Stoneburner*, 716 F.3d 926, 934 (6th Cir. 2013). An officer does not act in good faith when he acts with "wanton misconduct," which is defined as "conduct or a failure to act that shows such indifference to whether harm will result as to be equal to a willingness that harm will result." *Odom*, 482 Mich. at 475. Considering the facts in the light most favorable to Plaintiff, a jury could determine that Plaintiff was complying with Defendant May's commands to exit the house and Defendant May was indifferent as to whether he harmed Plaintiff by pushing him. Thus, Defendant May is not entitled to governmental immunity and Plaintiff's battery claim against Defendant May will survive summary judgment.

### C. Gross Negligence

Finally, Plaintiff brings claims of gross negligence against Defendant Larrison, the "Commander of BAYANET," and Defendant Williams, "the officer in charge of the warrant execution" at issue here. ECF No. 29 at PageID.399. Plaintiff alleges that Defendants Larrison and Williams were grossly negligent by permitting officers[11] who had not completed the annual "[r]aid [e]ntry [r]efresher [p]rogram" training to assist in executing the search warrant. ECF No. 96 at

---

[11] In his Amended Complaint, Plaintiff only alleges that one officer—Defendant May—did not complete the required raid entry refresher program training. ECF No. 29 at PageID.399–401. In his Response to Defendants' Motion for Summary Judgment, he also alleges that Defendants Bush and Trafalet had not completed the training, and that it is unknown whether Defendants Kearns or Williams did. ECF No. 96 at PageID.2242.

PageID.2242. Defendants argue they are entitled to summary judgment because these claims are barred by governmental immunity. ECF No. 90 at PageID.1917–18.

In Michigan, government employees are immune from tort liability for injury to a person caused by the employee while in the course of their employment if the following three criteria are satisfied: (1) the employee was acting reasonably or believes he or she is acting within the scope of his or her authority; (2) the governmental agency is engaged in the exercise or discharge of a governmental function; and (3) the employee's conduct does not amount to gross negligence that is the proximate cause of the injury. MICH. COMP. LAWS § 691.1407(2). "Gross negligence" is defined by statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* at § 691.1407(7)(a). And "[t]he phrase 'the proximate cause' is best understood as meaning the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000) (quoting MICH. COMP. LAWS § 691.1407(2)).

Defendants Larrison and Williams were acting within the scope of their authority and engaged in the discharge of a governmental function when they assembled a team of officers to execute a search warrant. *See Tate v. Grand Rapids*, 671 N.W.2d 84, 87 (Mich. App. 2003) (noting police activity is a governmental function contemplated by the GLTA); *Flones v. Dalman,* 502 N.W.2d 725, 729 (Mich. App. 1993) (holding the execution of a facially valid search warrant is a government function). Thus, the relevant question here is whether Defendants Larrison and Williams' assembly of a team of officers that included some whose raid entry refresher training was expired amounted to gross negligence that was *the proximate cause* of Plaintiff's injuries. *See* MICH. COMP. LAWS § 691.1407(2). Defendants argue their conduct did not amount to gross negligence, and even if it did, it was not *the proximate cause* of Plaintiff's injuries. ECF No. 90 at

PageID.1920–21. In response, Plaintiff dedicates five pages to why Defendants' conduct was grossly negligent but ignores proximate causation altogether. *See generally* ECF No. 96 at PageID.2240–45. This Court "need not determine whether any of the officers' conduct satisfies the gross negligence standard because [Plaintiff] cannot show that their alleged negligence caused [his] injuries." *Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 478 (6th Cir. 2021).

In Michigan, to overcome governmental immunity, a plaintiff must prove that the defendant's gross negligence was the proximate cause of the plaintiff's injury, which means "the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000); *see also Ray v. Swager, 903* N.W.2d 366, 371–76 (Mich. 2017). Establishing proximate cause [under Michigan's GLTA] is a high bar. *Walker v. Detroit Pub. Sch. Dist.*, 535 F. App'x 461, 467 (6th Cir. 2013).

Here, Plaintiff has not met that high bar. Indeed, drawing all factual inferences in favor of Plaintiff as is required, the record is clear that the proximate cause of Plaintiff's injury was Defendant May's push, which caused Plaintiff to fall off the interior porch. *See* ECF Nos. 88-2 at PageID.1740 ("[Defendant] May was pushing [Plaintiff] to exit the kitchen when [Plaintiff] tripped over the hoses."); 88-4 at PageID.1782 ("he pushed me off and I fell off that landing, that's what I can remember"); 110 at PageID.2444 ("[I]t's very possible [Plaintiff's fall] was from the momentum I was providing him because he was refusing to go to the door."). Accordingly, Defendants Larrison and Williams are entitled to governmental immunity because their assembly of a team of officers that included some officers whose raid entry refresher training was expired was not *the proximate cause* of Plaintiff's injuries. *See Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 478 (6th Cir. 2021) (finding summary judgment for government defendants is proper where "[n]o reasonable jury could find that [the government defendants' negligence] was 'the one

most immediate, efficient, and direct cause' preceding [plaintiff's] injuries." (quoting *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 553 (6th Cir. 2009))).

Thus, Defendants' Motion for Summary Judgment will be granted and Plaintiff's gross negligence claims against Defendants Larrison and Williams will be dismissed.

**IV.**

Accordingly, it is **ORDERED** that Defendant Rutledge's Motion for Summary Judgment, ECF No. 88, is **GRANTED**.

Further, it is **ORDERED** that Defendant Rutledge is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Defendants Jason Bledsoe, James Bush, Richard Kearns, Timothy Larrison, Joshua May, John Traflet, and James Williams's Motion for Summary Judgment, ECF No. 90, is **GRANTED IN PART**, to the extent it seeks to dismiss Plaintiff's gun-display and gun-pointing claims, Plaintiff's too-tight handcuffing claim, Plaintiff's gross negligence claim, Plaintiff's failure-to-intervene claim against Defendant Bush related to Plaintiff's fall off the interior porch, and all claims against Defendants Bledsoe, Kearns, Larrison, and Williams.

Further, it is **ORDERED** that Plaintiff's failure-to-intervene claim alleged in Count I against Defendant Bush related to Plaintiff's fall off the interior porch is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Defendant Bledsoe is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Defendant Kearns is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Defendant Larrison is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Defendant Williams is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Plaintiff's excessive-force claim alleged in Count I against Defendant Joshua May related to the display and pointing of a gun is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Plaintiff's too-tight handcuffing claim alleged in Count I is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Plaintiff's gross negligence claim alleged in Count II is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that that Defendants Jason Bledsoe, James Bush, Richard Kearns, Timothy Larrison, Joshua May, John Traflet, and James Williams's Motion for Summary Judgment, ECF No. 90, is **DENIED IN PART** in all other respects. Plaintiff's remaining claims are illustrated in the table below:

| COUNT | DEFENDANT(S) | CLAIM |
|---|---|---|
| Count I | Joshua May | Excessive Force: Push |
| Count I | Joshua May | Excessive Force: Handcuffing |
| Count 1 | James Bush<br>John Trafelet | Failure to Intervene: Handcuffing |
| Count III | Joshua May | Battery |

**This is not a final order and does not close the above-captioned case**.

Dated: January 31, 2024                         s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge

- 28 -